## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH J. WATLEY,

     Plaintiff,

     v.

MICHAEL FELSMAN, DANIEL
NILON, and JAMES SOHNS,

     Defendants.

NO. 3:16-CV-02059

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me is a Motion to Alter or Amend Judgment (Doc. 104) filed by Defendants Michael Felsman ("Corporal Felsman") and Daniel Nilon ("Corporal Nilon") (together, "Corporals" or "Defendants") and Plaintiff Joseph Watley's Motion to Strike (Doc. 118) and Motion for Attorney's Fees and Costs (Doc. 98). For the reasons below, all three motions will be denied.

### I. Background

As the parties have already been through trial, only a brief summary of the facts will be provided.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 stemming from a series of encounters between Watley and the Corporals following a traffic stop on May 11, 2016. On May 11, 2016, Corporal Felsman pulled Watley over on Interstate 84 in Blooming Grove Township for impeding the flow of traffic, tinted windows, and a broken tail light. (Trial Tr., Oct. 15, 2018, at 25-29, 138; Trial Tr. Oct. 16, 2018, at 99). Prior to the traffic stop, Watley was driving home to Connecticut after purchasing a black Chevrolet Monte Carlo in Indiana. (Trial Tr., Oct. 15, 2018, at 67-68). Corporal Felsman was unable to pull up information on the license plate of the Monte Carlo driven by Watley and approached the vehicle on the passenger side. (*Id.* at 145-48, 151, 155). After repeatedly asking Watley to lower his windows because he could

not see through the tint, Corporal Felsman called for backup. (*Id.* at 85, 156-58). In the meantime, Watley held up a sign saying "I remain silent. No searches. I want my lawyer. Place any tickets under the wiper blade." (Trial Tr., Oct. 16, 2018, at 44).

Eventually, after other police officers arrived on the scene, Watley lowered his window slightly, just enough to hand over his driver's license and vehicle registration. (*Id.* at 45-47). Corporal Felsman returned to his patrol vehicle to run the license and registration and learned both that Watley had a criminal history and that the Monte Carlo was registered to Cheyenna Blake Lawson. (*Id.* at 48, 54; Trial Tr., Oct. 15, 2018, at 53). Trooper Schochin then tried to approach the vehicle to see if the photo on the license looked like driver of the car. (Trial Tr., Oct. 16, 2018, at 51). As Watley still had not exited the vehicle, the police officers on the scene contacted a supervisor, Corporal Romanchick, who told them he would come to the scene to assist them. (*Id.* at 68).

Once Corporal Romanchick, along with Sergeant Kennedy, arrived at the scene, the officers tried to maneuver their cars around the Monte Carlo to prevent Watley from fleeing. (*Id.* at 69, 73). Corporal Romanchick ordered Watley to exit the Monte Carlo, which he failed to do. (*Id.* at 74). Simultaneously, Corporal Felsman took out his department-issued baton and told Trooper Stanco to take out his gun in the event Watley was armed, and Corporal Nilon drew his department-issued taser. (*Id.* at 74-75). Shortly thereafter, Watley opened the door to his vehicle and was handcuffed. (*Id.* at 75-76). Watley was arrested because the officers at the time believed he would not return to Pennsylvania to face the traffic citations. (Trial Tr., Oct. 15, 2018, at 44, 61). Corporal Felsman then put leg shackles on Watley and placed him in the front seat of his vehicle to take him to the magistrate judge. (Trial Tr., Oct. 16, 2018, at 83, 87). During this time, Corporal Nilon and Trooper Sohns performed a search of Watley's vehicle, purportedly for valuables, before the car was taken to the lot at Lords Valley Towing. (*Id.* at 99, 146-150). The officers claimed they did not find any valuables in the vehicle apart from Watley's camera phone, which was given to

Corporal Felsman. (*Id.* at 87, 161).

Later that day, Corporal Felsman brought Watley before Magistrate Judge Cooper. Watley requested a lawyer and Magistrate Judge Cooper informed Watley he could not get a lawyer at that time. (*Id.* at 91). When Watley refused to plead guilty or not guilty, Magistrate Judge Cooper told Corporal Felsman to take Watley to Pike County Prison in lieu of collateral and issued a commitment order. (*Id.* at 92-93). Corporal Felsman then drove Watley to Pike County Prison in the same restraints as before. (*Id.* at 94).

The next morning, Corporal Felsman, along with Sergeant Kennedy, arrived at the prison and drove Watley, who was once again placed in restrains, to appear before Magistrate Judge Cooper. (*Id.* at 96-97; Trial Tr., Oct. 15, 2018 1 at 34). Early in the proceeding, Magistrate Judge Cooper noted that the summary trial should have been brought before Magistrate Judge Muir rather than himself because the traffic stop occurred in Blooming Grove Township. (Trial Tr., Oct. 16, 2018, at 99). Magistrate Judge Cooper released Watley on his own recognizance and instructed Corporal Felsman to drive Watley to the tow lot. (*Id.* at 99-101, 134; Trial Tr., Oct. 15, 2018, at 50).

Corporal Felsman informed Watley that he was no longer in custody at this time and that if he wanted to be driven to the tow lot, he would need to be placed in restraints. (Trial Tr., Oct. 15, 2018, at 36, 78; Trial Tr., Oct. 16, 2018, at 11, 101). Watley did not respond to Corporal Felsman and walked toward Corporal Felsman's patrol vehicle and got in. (Trial Tr., Oct. 15, 2018, at 80; Trial Tr., Oct. 16, 2018, at 11, 101). Corporal Felsman handcuffed Watley tightly and shackled his legs with his personal leg restraints that were not the property of the state police. (Trial Tr., Oct. 15, 2018, at 35, 77-78). Upon arriving at the tow lot, Corporal Felsman removed the restraints and told Watley he was free to go. (Trial Tr., Oct. 16, 2018, at 101). Watley then went over to speak with the owner of the lot and eventually headed back home. (Trial Tr., Oct. 17, 2018, at 17).

On October 13, 2016, Plaintiff filed a complaint in connection with the above events. (Doc. 1). On October 25, 2017, Plaintiff filed an amended complaint alleging unlawful search and seizure, excessive force, First Amendment retaliation, assault and battery, false arrest/false imprisonment, malicious prosecution, and abuse of process against Defendants. (*See* Doc. 23 *generally*). The parties then filed cross motions for summary judgment. (Doc. 28; Doc. 40). On March 29, 2018, I granted summary judgment in favor of Plaintiff as to liability for his seizure on May 12, 2016 (Count I, in part) and in favor of Defendants on the following claims: seizure and search of Watley's person by Trooper Felsman on May 11, 2016 (Count I, in part); excessive force as to the events of May 11, 2016 (Count II, in part); First Amendment retaliation (Count III); assault and battery as to the events of May 11, 2016; false arrest/false imprisonment (Count V), malicious prosecution (Count VI), abuse of process (Count II); the search and seizure of Watley by Trooper Nilon on May 11, 2016 (Count VIII). (Doc. 48). Trial began on October 15, 2018 and concluded on October 17, 2018.

At trial, after the presentation of Plaintiff's case-in-chief and again prior to Plaintiff's rebuttal, Defendants moved pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law, arguing judgment should be entered on behalf of Defendants on the search, assault and battery, excessive force, and seizure claims[1] because Watley did not meet his burden and the Defendants were entitled to qualified immunity. (Trial Tr., Oct. 15, 2018, at 107-17; Trial Tr., Oct. 16, 2018, at 166-173). I denied this motion on both occasions. (Trial Tr., Oct. 15, 2018, at 116-17; Trial Tr., Oct. 16, 2018, at 172-73). Ultimately, the jury found that Corporal Nilon violated Watley's Fourth Amendment right to be free from unreasonable searches and seizures and that Corporal Felsman violated Watley's Fourth Amendment right to be free from the use of excessive force, but that Watley did not suffer injuries from these violations

---

[1] Specifically, Defendants requested I reconsider my finding on summary judgment that a seizure occurred during the ride to the tow lot. (Trial Tr., Oct. 15, 2018, at 111-12)

or the seizure on May 12, 2016. (Doc. 95). As such, the jury awarded Watley $3.00 in nominal damages.

Both parties have filed post-trial motions. Plaintiff has filed a Motion for Attorney Fees and a Motion to Strike. (Doc. 98; Doc. 118). Defendants Felsman and Nilon have filed a Motion to Alter Judgment. (Doc. 104). All three (3) motions are ripe for review.

## II. Legal Standards

### A. Federal Rule of Civil Procedure 50(a) and 50(b)

Federal Rule of Civil Procedure 50(a) authorizes the entry of judgment as a matter of law. A motion for relief under this Rule may be made at any time before the case is submitted to the jury. Fed. R. Civ. P. 50(a)(2). Where, as here, a court denies a party's Rule 50(a) motion, "the court is considered to have submitted the action to the jury subject to the courts later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). In the event an adverse judgment is entered, the movant may renew the motion for judgment as a matter of law pursuant to Rule 50(b), which provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motions. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

*Id.* To prevail, the moving party "must show that the jury's findings, presumed or expressed, are not supported by substantial evidence, or if they (are), that the legal conclusions implied (by) the jury's verdict cannot in law be supported by those findings." *LifeScan, Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 345, 350 (D. Del. 2000); *see also Valenti v. Allstate Ins. Co.*, 243 F. Supp. 2d 221, 223 (M.D. Pa. 2003).

> In considering whether the evidence at trial was sufficient to sustain the jury's verdict, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of facts for the jury's version. Although judgment as a matter of law should not be granted liberally, a mere scintilla of evidence is insufficient to sustain

5

> a verdict of liability. The Court is not to ask whether there is literally no evidence supporting the verdict, but instead, whether there is evidence upon which the jury could properly find a verdict for the prevailing party. Accordingly, if the evidence of record is insufficient to support the jury's verdict, then motion for judgment of law should be granted.

*Moore v. Susquehanna Area Reg'l Airport Auth.*, No. Civ A. 1:02-CV-0535, 2005 WL 2430790, at *3 (M.D. Pa. Sept. 30, 2005) (citations omitted).

A motion for judgment as a matter of law should be granted if, "viewing the evidence in the light most favorable to the non-movant and giving every advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 492 (3d Cir. 2002); *see also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 209 (3d Cir. 2008).

## B.    Federal Rule of Civil Procedure 59(e)

Rule 59(e) of the Federal Rules of Civil Procedure allows a party to move to alter or amend a judgment within twenty-eight days of its entry. A judgment may be altered or amended if the party seeking reconsideration establishes at least one of the following grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court granted the motion []; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café, by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). "A motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of." *Odgen v. Keystone Residence*, 226 F. Supp. 2d 588, 606 (M.D. Pa. 2002). "[R]econsideration motions may not be used to raise new arguments or present evidence that could have been raised prior to the entry of judgment." *Hill v. Tammac Corp.*, Civ. A. No. 05-1148, 2006 WL 529044, at *2 (M.D. Pa. Mar. 3, 2006). The reconsideration of a judgment is an extraordinary remedy, and such motions should be granted sparingly. *D'Angio v. Borough of Nescopeck*, 56 F. Supp. 2d 502, 504 (M.D. Pa. 1999).

**C.     Attorney's Fees**

Congress has provided that "[i]n any action or proceeding to enforce a provision of section[] . . . 1983, . . . of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim and [t]he plaintiff must obtain an enforceable judgment against the defendant for whom fees are sought. . .[.]" *Farrar v. Hobby*, 506 U.S. 103, 111, 113 S. Ct. 566 (1992) (citing *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S. Ct. 2672, 2675 (1987)).

## III.  Discussion

**A.     Motion to Alter or Amend Judgment**

Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, Defendants move to alter or amend the October 17, 2018 judgment on the seizure and excessive force claims based on the drive back to the tow lot against Corporal Felsman and the unreasonable search claim against Corporal Nilon based on the May 11, 2016 search of Watley's vehicle.  For the reasons that follow, Defendants' Motion will be denied.

### 1.     Unreasonable Seizure

Corporal Felsman asserts the unreasonable seizure finding against him was improper and raises three (3) arguments in support of his motion to alter or amend this portion of the judgment: (1) my summary judgment finding that Watley was seized on May 12, 2016 on the ride to the tow lot was improper; (2) the facts presented at trial do not support a finding that a seizure occurred in this incident; and (3) Corporal Felsman is entitled to qualified immunity on this issue.  Despite framing the first two arguments in the alternative of the other, Corporal Felsman appears to challenge my summary judgment finding in all three points, as the jury was neither charged with making nor actually made any factual conclusions as to whether a seizure actually occurred.

7

On March 29, 2018, I concluded not only that Watley properly alleged an unreasonable seizure claim based on the drive to the tow lot even though it was not explicitly stated in his third amended complaint, but also that he was entitled to judgment on this claim. (Doc. 47 at 12-17; Doc. 48). I found that the evidence submitted on summary judgment did not support a finding that Corporal Felsman's application of the restraints was "justified by the circumstances" and that Corporal Felsman was not entitled to qualified immunity as a result. (*Id.* at 16 (quoting *Hall v. Raech*, 677 F. Supp. 2d 784, 799 (E.D. Pa. 2010)). Corporal Felsman argues that evidence produced at trial which was not available for summary judgment undermines my summary judgment finding.

For the reasons stated in my March 29, 2018 memorandum, Watley's seizure allegation in his amended complaint satisfied the notice pleading requirement of Rule 8 of the Federal Rules of Civil Procedure. (Doc. 47 at 12-14). I therefore reject Corporal Felsman's argument that he was unable to offer the testimonial evidence presented at trial regarding a justification for the use of restraints in support of his summary judgment motion. Moreover, Corporal Felsman did not formally challenge my summary judgment finding[2] until Watley rested his case on October 15, 2018, well past the fourteen (14) day time frame for submitting a motion to reconsider under Local Rule 7.10. (Trial Tr., Oct. 15, 2018, at 107-117). Accordingly, I decline to amend amendment the $1.00 judgment against Corporal Felsman on this seizure claim.[3]

### 2. Excessive Force Claim

---

[2] I note counsel for Corporal Felsman implied their current position on this claim—that the facts do not support a finding that a seizure occurred—in the pretrial memorandum submitted on September 21, 2018. (Doc. 77 at 1-2, 5).

[3] As I decline to grant Defendants' Motion on this argument, Plaintiff's Motion to Strike Section A of Defendant's Brief in Support of the Motion to Alter or Amend Judgment (Doc. 118) will be denied as moot.

Watley's excessive force claim against Corporal Felsman was based on the same facts as the seizure claim: Corporal Felsman's use of restraints on the drive back to the tow lot from the court on May 12, 2016. Corporal Felsman argues this portion of the judgment should be altered or amended for the following reasons: (1) my decision to grant summary judgment in favor of Watley on his seizure claim was erroneous and led to the improper conclusion that a genuine dispute of material fact existed on the excessive force claim; (2) my instructions to the jury relating to the May 12, 2016 seizure were improper; and (3) Corporal Felsman is entitled to qualified immunity on this claim.

As to Corporal Felsman's first point, "[t]o state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004). As discussed above and in my March 29, 2018 memorandum, I concluded Corporal Felsman's conduct constituted a seizure under the Fourth Amendment at the summary judgment phase.[4] After reviewing the summary judgment record, I concluded the evidence presented at the time did not support a finding that Corporal Felsman's actions were reasonable, and Corporal Felsman did not challenge this finding until trial. (Doc. 47 at 23). I therefore decline to amend my summary judgment finding that a genuine issue of material fact existed as to whether Corporal Felsman's actions were reasonable.

Turning to Corporal Felsman's next point, I note that because of my summary judgment determination that Corporal Felsman's conduct on May 12, 2016 amounted to a seizure, the jury was not tasked with fact-finding on the seizure element of Watley's excessive force claim and instead only had to determine whether the seizure was reasonable. As such, I elected to instruct the jury as follows:

---

[4] For the reasons discussed above, Corporal Felsman's arguments seeking reconsideration of my summary judgment finding on the seizure issue are not proper.

> In this case, Mr. Watley was seized when he was restrained and driven to his car at the towing company. In other words, I'm telling you that you must find that he was seized by Trooper Felsman at that time. However, the question of whether excessive force was used remains for you to decide.

(Trial Tr., Oct. 17, 2018, at 61). I further instructed the jury they must determine "whether the amount of force Defendant Felsman used was the amount which a reasonable officer would have used under similar circumstances." (*Id.* at 61). I reiterated this reasoning in the conference on October 17, 2018 with both parties to address the jury's questions, specifically, the jury's request for a definition of "unlawful seizure." (*Id.* at 78). I resolved to "ask [the jury] if [they] are asking about No. 7 on the verdict slip, it has been decided that Corporal Felsman unlawfully seized Mr. Watley on May 12, 2016; therefore, a definition is not needed." (*Id.* at 80). No further questions came back from the jury on this matter. Further, my reasoning was consistent with item #1 on Defendants' own proposed special verdict questions sheet concerning the excessive force claim which stated "[w]as the force used by Corporal Felsman against Mr. Watley on May 12, 2018 [sic] reasonable under the circumstances?" (Doc. 88 at 1).

Corporal Felsman failed to cite to any case law in support of his assertion that my jury instructions constituted a clear error of law. *See Max's Seafood Café*, 176 F.3d at 677. My instructions, however, were neither clearly erroneous nor an abuse of discretion. *Cf. Porter v. City of Philadelphia*, 337 F. Supp. 3d 530, 556 (E.D. Pa. 2018) (determining trial court did not "usurp" the role of the jury in a *Monell* claim when instructing the jury that the sheriff's policy violated plaintiff's First Amendment right to freedom of speech and to petition, especially where no case law to the contrary was provided); *Alicea v. Ralston*, No. 03-3698, 2006 WL 2945250, at *4-*5 (E.D. Pa. Oct. 13, 2006) (concluding no prejudicial error in the trial court's use of the term "arrest" in an excessive force instruction where "the concept of arrest was not an issue at trial"). Indeed, the instruction provided in the Third Circuit's integrated instruction

and verdict form for a "Section 1983 Claim – Excessive Force (Stop, Arrest, or other 'Seizure')" does not provide a definition of "seizure." Model Civil Jury Instructions, Appendix One 2 (3d Cir. 2017); *see also Velius v. Twp. of Hamilton*, 754 F. Supp. 2d 689, 690 n.4 (D.N.J. 2010) (citing this model instruction in decision denying motion to alter judgment for excessive force claim).

Lastly, Corporal Felsman argues he is entitled to qualified immunity on the excessive force claim. "'Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 2093 (2012)). The Third Circuit has remarked that qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 215 (3d Cir. 2004). "In considering the applicability of qualified immunity, courts engage in a two-pronged examination." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015). First, a court decides "whether the facts that a plaintiff has shown make out a violation of a constitutional right." *Id.* If at the conclusion of this analysis a court finds that no constitutional violation took place, then the court must enter judgment in the defendant's favor. However, if a constitutional violation is found, a court must then determine "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 816 (2009). If the right violated was "clearly established," then the official is not entitled to qualified immunity.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate" for a right to be clearly established. *Id.* The Supreme Court does "not require a case directly on point, but existing precedent must

have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2944. Essentially, "in light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). This may be the case "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct violated constitutional rights." *Id.* at 740 (citation omitted).

In the instant case, the jury found Corporal Felsman's use of restraints against Watley—which were applied without his explicit consent and while was not under arrest—violated of Watley's Fourth Amendment right to be free from excessive force. (Doc. 95 at 3-4). Corporal Felsman contends this right has not been clearly established. However, in *Kopec v. Tate*, 361 F.3d 772 (3d Cir. 2004), "the Third Circuit ruled that a police officer, arresting an individual on February 2, 2000 . . . violated a clearly established constitutional right when he applied excessively tight handcuffs and failed to respond to the arrestee's repeated requests for them to be loosened, resulting in permanent nerve damage." *Armstead v. Twp. of Upper Dublin*, 347 F. Supp. 2d 188, 196 (E.D. Pa. 2004). Despite some of the factual differences between the instant case and *Kopec*, including the absence of a verbal complaint by of the handcuffs being too tight by Watley, case law nevertheless supports the conclusion that Watley's Fourth Amendment rights were clearly established at the time of the violation, as the Third Circuit concluded "a reasonable officer would have known that employing excessive force in the course of handcuffing would violate the Fourth Amendment." *Kopec*, 361 F.3d at 778.

In articulating its holding recognizing the right to be free from excessive force during handcuffing, the Third Circuit cited to a Ninth Circuit case, *Palmer v. Sanderson*, 9 F.2d 1433 (9th Cir. 1993), which found qualified immunity was not proper where evidence could show pain and bruising from the officer's application of handcuffs. *Kopec*, 361 F.3d at 778; *see also Palmer*, 9 F.3d at 1436 (denying qualified immunity and recognizing the right to be free from excessive force during handcuffing

is clearly established where the handcuffs were fastened "so tightly around [plaintiff's] wrist that they caused [plaintiff] pain and left bruises that lasted for several weeks"). In the instant case, testimony from Watley and his sister reveals Watley had still had deep impressions, bruising, and redness on his wrists even after he returned home to Connecticut. (Trial Tr., Oct. 15, 2018, at 75, 103). As such, Corporal Felsman is not entitled to qualified immunity on the excessive force claim. For these reasons, Corporal Felsman's Motion will be denied as to the excessive force claim.

### 3. Search and Seizure Claim

Corporal Nilon argues the jury's verdict that he unlawfully searched and seized Watley's vehicle was improper because (1) Question # 1 on the jury verdict questionnaire was misleading and confusing by stating "searches and seizures[,]" (2) the evidence does not support the verdict, and (3) he is entitled to qualified immunity.

As to Corporal Nilon's first point, I begin my discussion by noting his argument in the instant Motion differs slightly from the objection made at trial. In the Motion, Corporal Nilon asserts that using the term "searches and seizures" was misleading and confusing because the evidence does not support a finding that the vehicle was towed. At trial, counsel for Corporal Nilon objected to the instruction on the basis that this claim was only about a search, and adding the word "seizure" is therefore confusing. (Trial Tr., Oct. 17, 2018, at 24 ("[W]e believe including the words searches and seizures in the question is misleading and maybe confusing to the jury, because we have a search claim, and then we also have the seizure claim. We believe the words and seizures should be removed from that."). However, because the trial transcript shows counsel for Corporal Nilon also attempted to argue the vehicle was not seized, I will treat this objection as properly preserved under Rule 51 of the Federal Rules of Civil Procedure.

First, Corporal Nilon's argument at trial—that the underlying claim for which Question #1 sought a verdict was only a search claim—is not supported by the record. Indeed, Count IX of Watley's Amended Complaint explicitly concerns the "unlawful

search and seizure" of Watley's vehicle, and I addressed the claim as such in my summary judgment memorandum opinion. (Doc. 23 ¶¶ 57-63; Doc. 47 at 11). Including the term "seizures" in Question # 1 of the jury verdict questionnaire was therefore was not misleading and confusing on this basis, as the jury was tasked with determining Corporal Nilon's liability on Watley's claim for the "unlawful search and seizure" of his vehicle.

Turning to Corporal Nilon's argument in the Motion, I find the evidence offered at trial supports the jury's conclusion that a seizure occurred. Under the Fourth Amendment, a "seizure" of property "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty.*, 506 U.S. 56, 61, 113 S. Ct. 538 (1992). As shown in the video entered into evidence at trial ("Plaintiff's Exhibit 1"), the officers on the scene handcuffed Watley and went through the contents of the vehicle before it was driven off to the tow lot. (Pl.'s Ex. 1). Corporal Nilon argues this does not amount to a seizure because the evidence shows that a private, third-party company removed the vehicle from the highway and also that the car would not have been taken to the tow lot if another valid driver was present. (Trial Tr., Oct. 16, 2018, at 146). However, around fifty-two (52) minutes into the video, the officers on the scene obtained the keys to the Monte Carlo and used these keys to access the vehicle and perform the search. (Pl.'s Ex. 1). Though not depicted in the video, Corporal Nilon testified that the tow company drove the vehicle to the tow lot, which supports the inference that the police handed the keys over to the tow company and gave them permission to tow the vehicle. (Trial Tr., Oct. 16, 2018, at 151-52). The possibility that the officers on the scene may not have impounded the vehicle if another driver was present does not change the legal significance of what actually occurred: Watley's keys were taken by the police and used to search the car, and the car was brought to a tow lot and separated from Watley's person. A reasonable jury could have concluded from this evidence that Watley's possessory interests in the vehicle were meaningfully interfered with by the

officers on the scene, including Corporal Nilon. As Corporal Nilon failed to explain how Question #1 could otherwise be "'capable of confusing and thereby misleading the jury[,]'" I find my inclusion of the term "seizure" in Question #1 of the jury verdict questionnaire was not erroneous. *Limbach Co. v. Sheet Metal Workers Int'l Ass'n*, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991) (quoting *Link v. Mercedes-Benz of North Am., Inc.*, 788 F.2d 918, 922 (3d Cir. 1986)).

Second, Corporal Nilon argues there was no evidence from which the jury could have concluded that the vehicle search violated Watley's Fourth Amendment rights. This position reflects a misunderstanding of the question presented to the jury on this issue:[5] whether the search of Watley's vehicle constituted a valid inventory search. The inventory search exception to the warrant requirement is just that: an exception. *See Colorado v. Bertine*, 479 U.S. 367, 371, 107 S. Ct. 738 (1987) ("[A]n inventory search may be 'reasonable' under the Fourth Amendment even though it is not conducted pursuant to a warrant based on probable cause."). Not all searches of vehicles are inventory searches. According to the Supreme Court, inventory searches are performed "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* at 372, 107 S. Ct. at 741.

At trial, Defendants offered testimony that the search of Watley's vehicle was conducted pursuant to department policy but did not offer the policy itself. (Trial Tr., Oct. 16, 2018, at 80, 146, 149). Corporal Nilon explained that an inventory search is "a search of the vehicle for valuables. It's not a search for drugs. It's not a way around

---

[5] Corporal Nilon asserts the issue is "whether the inventory search was conducted pursuant to a standardized police criteria or an established routine, consistent with the purpose of a non-investigative search," not whether the officers "lacked probable cause to search the vehicle for incriminating evidence and therefore violated Watley's right to be free from unreasonable searches." (Doc. 117 at 23). This statement of the issue presents only part of the inventory search exception standard.

a search warrant" and covers "[n]ormal places where whoever is in the vehicle could stow valuables without going in-depth. Wherever we think something of value would be placed in the car. Nothing crazy." (*Id.* at 147-48). Corporal Nilon further testified that, consistent with standard police policy, he did not record the search because nothing of value was found. (*Id.* at 151). Corporal Nilon testified he did not find an envelope filled with cash during his search of the car even though testimony from Watley shows that the envelope was still in his car when he returned the next day. (*Id.* at 151; Trial Tr., Oct. 15, 2018, at 92; Trial Tr., Oct. 17, 2018, at 17). The video presented at trial also shows that a cell phone was recovered from the vehicle. (Pl.'s Ex. 1). Additionally, approximately fifty-four (54) minutes into the video, Corporal Nilon lifts up what appears to be the flap covering the spare tire in the trunk and then returns to look around the front seat again, which he previously checked. (*Id.*).

Taken together, this evidence is sufficient to support the conclusion that Corporal Nilon did not comply with the standard policy for inventory searches. The evidence reflects that two items of value in the vehicle, Watley's cell phone and an envelope containing $800, were either not discovered at all or were discovered and not recorded in violation of department policy. The places searched, namely, the spare tire flap, could also support the conclusion that Corporal Nilon was not merely searching for valuables, but was instead looking for evidence of a crime. Thus, a reasonable jury could conclude the warrantless search of Watley's vehicle violated the Fourth Amendment because it exceeded the scope of the inventory search exception.

Corporal Nilon also argues the jury's verdict is internally inconsistent, as Trooper Sohns, who "performed the *same* search activities on the *same* vehicle at the *same* time using the *same* procedure as Corporal Nilon, as depicted in the video[,]" was not found liable on the claim. (Doc. 117 at 22 (emphasis in original)). However, as detailed below, the video reveals this is not so, as the officers performed different activities throughout the search.

The search begins approximately fifty-two (52) minutes and forty (40) seconds

into the video with one officer pressing the unlock button on the key fob and tossing the keys to Trooper Sohns and Corporal Nilon opening the left driver's side car door immediately after it was unlocked. (Pl.'s Ex. 1). Corporal Nilon's movements can be seen in the video despite the window tint—he can seen looking around the front seat, crawling into the passenger seat, flipping down the front visor, physically moving the front seat to search the back seat area, checking underneath the seats, opening the trunk, looking through a plastic bag in the trunk, lifting the flap in the trunk that appears to cover the spare tire, returning to the driver's seat to look around again, and moving the driver's seat once more. (*Id.*). Trooper Sohns, by contrast, takes the keys to the car, opens the front passenger door, and speaks with another officer before beginning to look through the car. (*Id.*). The video shows Corporal Nilon consistently investigating the contents of the vehicle for the entire length of the search; however, Trooper Sohns frequently gets out of the car to speak with other officers, places items on the roof of the car, turns Watley's cell phone over to another officer, and watches from outside of the vehicle as Corporal Nilon continues his search. (*Id.*). Though Trooper Sohns is shown looking around the trunk from afar, Corporal Nilon performs the more in-depth search of the trunk by moving objects, opening containers, and searching through those containers. Lastly Trooper Sohns is shown standing behind Waltey's vehicle, frequently turning his head in the opposite direction of Corporal Nilon while Corporal Nilon looks through the front seat one last time. (*Id.*).

This shows that while Trooper Sohns participated in parts of the search, Corporal Nilon led the search and looked through the vehicle and its compartments in greater depth. I therefore conclude evidence was presented from which a reasonable jury could find only Corporal Nilon violated Watley's Fourth Amendment rights because Trooper Sohns's actions were noticeably less invasive.

Lastly, Corporal Nilon claims he is entitled to qualified immunity on this claim. Corporal Nilon is correct that there is no "clearly established law" that a proper inventory search violates an individual's Fourth Amendment rights. However,

inventory searches are limited to what is authorized by standardized criteria to ensure officers "performing these care-taking functions are 'not [] allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime.'" *United States v. Mundy*, 621 F.3d 283, 288 (3d Cir. 2010) (quoting *Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632 (1990)). A reasonable officer in Corporal Nilon's position would know that warrantless searches that do not comply with internal policies or one for which valuables are not the objects of the search do not fall under the inventory search exception and are therefore unreasonable under the Fourth Amendment unless another exception applies. *See California v. Acevedo*, 500 U.S. 565, 580, 111 S. Ct. 1982 (1991) ("It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions.") (quotation marks omitted). It is therefore clearly established law that a police officer may not look through bags, under seats, in the trunk, or where the spare tire is kept without a warrant when the neither the inventory search exception nor any other warrant exception applies. *See Wells*, 496 U.S. at 5, 110 S. Ct. 1632 (concluding that opening a closed container during a purported inventory search where there was no policy allowing for such conduct violated the Fourth Amendment). For these reasons, the judgment against Corporal Nilon's on this claim will not be amended.

## B.     Motion for Attorney's Fees and Costs

Plaintiff seeks $43,034.96 in attorney's fees and costs. (Doc. 125 ¶ 6). Defendants have not raised objections to the hours worked or expended as stated by Plaintiff, nor requested a specific reduction in the lodestar amount. Instead, Defendants argue Plaintiff's entire fee petition should be denied, as Plaintiff was only awarded nominal damages.

### 1.     Attorney's Fees

To be eligible for an attorney's fee award, a plaintiff must establish that (1) he

is the prevailing party, and (2) that the requested fee is reasonable. 42 U.S.C. § 2000e-5(k); *see also Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566 (1992). Civil rights plaintiffs who receive only nominal damages are nevertheless considered prevailing parties under 42 U.S.C. § 1988. *Farrar*, 506 U.S. at 105, 113 S. Ct. 566. Thus, the only remaining question is what constitutes a "reasonable" attorney's fee in the context of a nominal damages case.

### a.    Reasonableness of Fees

In *Farrar*, the Supreme Court addressed the issue of attorney's fees where the plaintiff is awarded only nominal damages. *Farrar* involved the operator of a Texas school for troubled teens who sued several officers of the state under § 1983 after the school was temporarily closed due to the death of a student. *Id.* at 105-07. Farrar sought seventeen million dollars ($17 million) and the jury found that only one of the defendants "committed an act or acts under color of state law that deprived Plaintiff []  of a civil right[,]" but that defendant's actions were not "a proximate cause of any damages" incurred. *Id.* While Farrar was initially denied nominal damages, he was later awarded nominal damages on remand from the Fifth Circuit. *Farrar v. Cain*, 756 F.2d 1148 (5th Cir. 1985). On remand from the Fifth Circuit, the district court utilized the lodestar method to determine and awarded more than three hundred thousand dollars ($300,000) in attorney's fees, expenses, and interest. *Farrar*, 506 U.S. at 106, 113 S. Ct. 566.

In reviewing this fee award, the Supreme Court held a plaintiff awarded nominal damages is a "prevailing party" because a nominal damages award "materially alters the legal relationship between the parties." *Id.* at 111-12. As such, the Court found Farrar was eligible for a "reasonable" attorney's fee award as the prevailing party. However, the Court ultimately vacated the fee award entirely, reasoning that Farrar's "technical" or "*de minimis*" victory did not warrant any fee, much less an award of the full lodestar amount. *Id.* at 115-16. The critical factor in analyzing reasonableness, the Court found, was "the degree of the plaintiff's overall success." *Id.* at 114 (citing

*Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S. Ct. 1933 (1983)). Observing the disparity between the seventeen million dollars ($17 million) sought and the nominal damages received, the Court concluded the litigation "accomplished little" beyond "moral satisfaction." *Id.*

The *Farrar* Court explained that "the only reasonable fee" in a nominal damages case "is usually no fee at all," but did not delve into what separates the "usual" cases from unusual ones. *Id.* at 115. Justice O'Connor, writing separately in a concurring opinion, suggested three (3) factors courts may consider in making this distinction: (1) the "extent of relief[;]" (2) the "significance of the legal issue on which the plaintiff prevailed[;]" and (3) the "public purpose served by the plaintiff's success." *Id.* at 121-22, 113 S. Ct. at 578 (O'Connor, J., concurring). Ultimately, Justice O'Connor concluded the *de minimis* nature of Farrar's victory was "readily apparent." *Id.*

*Farrar* therefore establishes that a district court's "central" responsibility in fixing a fee award in nominal damages cases is to "make the assessment of what is a reasonable fee under the circumstances." *Id.* at 114-15 (citing *Blanchard v. Bergeron*, 489 U.S. 87, 96, 109 S. Ct. 939 (1989)). This requires giving "primary consideration [to] the amount of damages awarded as compared to the amount sought." *Id.* at 115 (quoting *Riverside v. Rivera*, 477 U.S. 561, 585, 106 S. Ct. 2686 (1985) (Powell, J., concurring)). "It does not mean, however, automatically denying an attorney's fee in every nominal damages case—as the Third Circuit has recognized, that is exactly what *Farrar* does not require." *Pickens v. Se. Pa. Transp. Auth.*, No. 15-1489, 2017 WL 3722427, at *7 (E.D. Pa. Aug. 29, 2017); *see also Jama v. Esmor Corr. Servs., Inc.*, 577 F.3d 169, 176 (3d Cir. 2009) ("[W]e find no case in which a court of appeals has interpreted *Farrar* to require the automatic denial of fees . . . when only nominal damages are awarded. We agree with our sister circuit courts . . . ."). *Farrar* thus provides district courts with

> substantial discretion to decide whether no fee or some fee would be reasonable, as long as they acknowledge that a nominal damages award is presumptively a technical victory that does not merit an

20

> award of attorneys' fees. Whenever the trial court determines that no fee or a low fee is proper, *Farrar* eliminates the need to apply multi-factor tests or calculate the lodestar.

*Velius v. Twp. of Hamilton*, 466 F. App'x 133, 140-41 (3d Cir. 2012).

Plaintiff's victories on his search and seizure and excessive force claims in the instant case are unlike other post-*Farrar* cases in the Third Circuit in which courts have found Justice O'Connor's factors not only applied, but also warranted overriding the presumption of no fees in a technical or *de minimis* victory involving nominal damages only. *E.g. Mitchell v. City of Phila.*, No. 99-6306, 2010 WL 1370863, at *5 (E.D. Pa. Apr. 5, 2010) (finding attorney's fees reasonable where plaintiff's goal in commencing litigation was to compel specific behavior by defendant and even though only nominal damages were awarded, defendant ultimately took remedial action)*; Haines v. Forbes Road Sch. Dist.*, Nos. 1:07-cv-00851; 1:107-cv-00852, 2010 WL 56101, at *3-*4 (M.D. Pa. Jan. 5, 2010) (overriding the presumption based because the verdict repaired plaintiff's reputation in the community and noting the particular importance of the right to bodily integrity where a teacher sexually assaults a student); *see also Yarnall v. Phila. Sch. Dist.*, 203 F. Supp. 3d 558, 566 (E.D. Pa. 2016) ("This case is not like *Jama*, where the plaintiff received a substantial victory on her pendant state-law claim in addition to the nominal damages she was awarded on her § 1983 claim. . . . [Plaintiffs] failed to 'prove actual, compensable injury' . . . and consequently, their victory on that claim was merely technical.") (quoting *Farrar*, 506 U.S. at 114, 115, 113 S. Ct. at 575) (citations omitted).

Even were I to consider Justice O'Connor's factors, I would still conclude no fee is appropriate here on the search and seizure and excessive force claims. First, while the record does not contain a dollar amount for the damages Plaintiff sought, the difference between the amount recovered and the amount sought is still significant. *See Farrar*, 506 U.S. at 121, 113 S. Ct. at 578. Of Plaintiff's nine (9) claims in his complaint, for which he sought "all equitable remedies allowable at law, out of pocket expenses, emotional distress, punitive damages, injunction against future acts, attorney

fees and costs, pre- and post- interest, and delay damages[,]" only four (4) proceeded to trial, where he was awarded nominal damages on three (3) of these claims against only two (2) of the three (3) defendants. (Doc. 23; Doc. 95). In addition, Plaintiff was not awarded compensatory or punitive damages on any of his claims. (Doc. 95; Doc. 97). Thus, there is a notable difference between the relief sought by Plaintiff and the relief awarded, only three dollars ($3.00) in nominal damages.

The final two factors, the significance of the legal issues on which Plaintiff prevailed and whether the verdict serves an "important public purpose[,]" do not justify awarding attorney's fees and costs for the search and seizure and excessive force claims. *Jama*, 577 F.3d at 169. Plaintiff appears to argue both factors simultaneously, claiming nominal damages victory will deter police officers committing similar acts in the future. Plaintiff relies on two non-precedential cases in support of this argument: *Haines v. Forbes Road Sch. Dist.*, Nos. 1:07-cv-00851; 1:107-cv-00852, 2010 WL 56101 (M.D. Pa. Jan. 5, 2010) and *Buss v. Quigg*, 91 F. App'x 759 (3d Cir. 2004). *Haines* concerns a lawsuit in which a student was awarded only nominal damages on a § 1983 claim based on a violation of her "civil right to bodily integrity" by her former teacher who "brushed his hand across her chest and felt her leg, up her skirt to her buttocks[.]" *Haines*, 2010 WL 56101, at *1. In concluding attorney's fees were reasonable, the district court acknowledged the civil right to bodily integrity is "important as compared to other civil rights" and that the plaintiff's "reputation in the community was redeemed by her victory in the case[.]" In using this particular method to determine the significance of the legal issue, the district court in *Haines* relied on two non-binding cases predating *Jama*, *Hare v. Potter*, 549 F. Supp. 2d 698, 706-07 (E.D. Pa. 2008) and *Phelps v. Hamilton*, 120 F.3d 1125, 1132 (10th Cir. 1997), and failed to cite to *Jama*, in which the Third Circuit analyzed the significance of the legal issue factor without utilizing either of the methods discussed in *Hanes*. As such, *Haines* distinguishable from the instant case based on the facts and outdated law.

In *Buss*, which pre-dates *Jama* and *Velius*, the Third Circuit concluded, without

explanation, that the legal issues involved in the plaintiff's case against the state police were legally significant. *Buss*, 91 F. App'x at 761. Specifically, the Court stated:

> The determination that Buss and her family acted rightly in defending their Fourth and Fourteenth Amendment rights is significant relief under *Farrar*. This is especially so when coupled with the legal significance of unreasonable search and seizure and the public purpose of deterring such behavior. We conclude also that the illegal entry component was a central element of Buss's claim. For these reasons, we agree with the District Court in finding that Buss did achieve a significant degree of success in prosecuting her claim and that Buss could recover attorneys fees in spite of the nominal damages she received.

*Id.* To the extent the Court made a determination on the legal significance of the victory, it was not analyzed as a separate factor and instead appears to serve as a premise in support of the broader conclusion as to the plaintiff's degree of success. Moreover, the standard the *Buss* Court applied to determine reasonableness is inconsistent with the application of Justice O'Connors *Farrar* factors in *Jama* and *Velius*. *See id.* (applying the following standard: "[w]hen assessing whether a plaintiff who has won only nominal damages may reasonably be awarded fees, courts look to the 'degree of success obtained'") (quoting *Farrar*, 506 U.S. at 114, 113 S. Ct. at 574).

These cases offer little, if any support, in favor of Plaintiff's argument especially given that more recent case law weighs against finding for Plaintiff on this factor. In denying the plaintiff's request for attorney's fees on remand from the Third Circuit in *Velius*, the district court applied the *Farrar* precedent and abandoned its prior conclusion that the nominal damages awarded taught future law enforcement officials what could constitute excessive force while handcuffing an arrestee. *Velius v. Twp. of Hamilton*, No. 09-53, 2012 WL 2397939, at *2 (D.N.J. June 22, 2012); *Velius v. Twp. of Hamilton*, 754 F. Supp.2d 695, 699 (D.N.J. 2011), *vacated*, 466 F. App'x 133 (3d Cir. 2012). Other district courts in the Third Circuit have also determined nominal damages awards, where the jury's verdict "merely signifies" a plaintiff's rights have been violated and "[n]o other significant legal issue was decided[,]" in Fourth Amendment cases like this one do not raise a significant constitutional issue. *Anderson*

23

*v. City of Philadelphia*, No. 11-4623, 2013 WL 1008062, at *6 (E.D. Pa. Mar. 4, 2013); *see also, e.g.*, *Jordan ex rel. Arenas-Jordan v. Russo*, No. 09-88, 2014 WL 869482, at *11 (W.D. Pa. Mar. 5, 2014) (denying attorney's fees in case involving Fourth Amendment nominal damages and noting in light of *Farrar* and *Velius* "it is unclear how strongly this factor should weigh in favor of an award of attorney's fees in the face of a nominal verdict").

However, these final two factors weigh in favor of awarding attorney's fees award on Plaintiff's unreasonable seizure claim. The Fourth Amendment does not empower law enforcement to create a situation in which an individual is faced with the false choice of submitting to arrest or being stranded in an unfamiliar location without his vehicle, money, or other belongings. Indeed, "the Fourth Amendment does not tolerate an officer's unreasonable searches and seizures just because he did not know any better" and such judgments against negligent officers or those "in doubt of what the law requires . . . gives them an 'incentive to err on the side of constitutional behavior.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2070-71 (2016) (Sotomayor, J., dissenting) (quoting *United States v. Johnson*, 457 U.S. 537, 561, 102 S. Ct. 2579 (1982)). Moreover, Plaintiff's nominal damages victory is hardly limited to his specific scenario in light of the frequency in which traffic stops initiate criminal proceedings. His victory, which "tells everyone, white and black, guilty and innocent[.] . . . It says that your body is subject to invasion while courts excuse the violation of your rights. It implies that you are not a citizen of a democracy but the subject of a carceral state, just waiting to be catalogued[,]" therefore serves an important public purpose. *Id.* at 2070-71 (2016).

I therefore find attorney's fees are unreasonable on Plaintiff's excessive force and unreasonable search and seizure claim but reasonable on Plaintiff's unreasonable seizure claim.

### b.     Fee Award

"'The starting point for a court's determination of reasonable attorney's fees is

to calculate the 'lodestar' by multiplying the number of hours reasonably expended by each attorney by a reasonable hourly rate.'" *Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 506 (M.D. Pa. 2016) (quoting *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:02-CV-0134, 2014 WL 2860863, at *5 (M.D. Pa. June 23, 2014), *amended* by 2014 WL 2991813 (M.D. Pa. July 2, 2014) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933 (1983)). The lodestar calculation is presumed to be a reasonable calculation of attorneys' fees. *Washington v. Phila. Cty. Ct. Comm. Pl.*, 89 F.3d 1031, 1035 (3d Cir. 1996).

"The opposing party may object to the lodestar calculation, calling into question either the reasonableness of the hourly rate requested or the reasonable hours expended." *Clarke v. Whitney*, 3 F. Supp. 2d 631, 633-34 (E.D. Pa. 1998). When objecting to the hours expended, "the opposing party may request a reduction of the lodestar on the grounds that, *inter alia*, the hours expended on the litigation were excessive, redundant, or unnecessary." *Id.* (citing *Hensley*, 461 U.S. at 434, 103 S. Ct. at 1939-40). A court may also reduce the number of hours "litigating claims on which the party did not succeed and that were 'distinct in all respect from' claims on which the party did succeed." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). "The party opposing the request 'has the burden of proving that it is appropriate [to adjust the lodestar], and if that burden is met, the lodestar amount may be increased or decreased at the discretion of the District Court.'" *Borrell*, 207 F. Supp. 3d at 506 (quoting *Dee v. Borough of Dunmore*, No. 3:05-CV-1342, 2013 WL 685144, at *4 (M.D. Pa. Feb. 25, 2013)).

### (i)  Hourly Rates

To determine prevailing market rates, the court "should address the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Loughner v. Univ. of Pittsburgh*, 260 F. 3d 173, 180 (3d Cir. 2001) (citing *Dellarciprete*, 892 F.2d at 1183). A burden shifting analysis is

applied to determine the rate. *See Evans v. Port Auth. of N.Y. and N.J.*, 273 F.3d 346, 361 (3d Cir. 2001). The plaintiff bears the initial burden of establishing a *prima facie* case through the production of sufficient evidence demonstrating a reasonable market rate "for the essential character and complexity of the legal services rendered." *Smith v. Phila. Hous. Auth.*, 107 F.3d 223, 225 (3d Cir. 1997). To meet its burden, the fee petitioner must "submit evidence supporting . . . the rates claimed" *Dellarciprete*, 892 F.2d at 1183 (citing *Hensley*, 461 U.S. at 433, 103 S. Ct. 1933), consisting "of satisfactory evidence, 'in addition to [the] attorney's own affidavits,' . . . that the requested hourly rates meet this standard.'" *Loughner*, 260 F.3d at 180 (citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11, 104 S. Ct. 1541 (1984)*; Washington v. Phila. Cty. Ct. Comm. Pl.*, 89 F.3d 1031, 1035 (3d Cir. 1996)).

The party opposing the fee petition then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee." *Dellarciprete*, 892 F.2d at 1183 (citing *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713 (3d Cir. 1989)). "Once the adverse party raises objections to the fee request, the district court has a great deal of discretion to adjust the fee award in light of those objections." *Id.* (citations omitted).

Attorney Pollick did not make clear the rate at which she seeks compensation, noting that the Community Legal Service of Philadelphia ("CLS") chart "proposes the hourly rate of $450 to $510 for a lawyer who has been practicing between 16-20 years," but also noting that in 2016 Judge Mariani awarded her a $275.00 hourly rate. (Doc. 98 ¶ 3). In support of her proposed hourly rate, Attorney Pollick submitted the aforementioned CLS chart that "lists the fee schedule used by CLS only in cases in which the law allows for the award of attorney's fees from opposing parties in order to compensate CLS for the legal services provided to its clients." (Doc. 98-5). This chart is effective as of February 15, 2017 and is based on "Philadelphia law firm market survey data and increases in the Consumer Price Index[.]" (*Id.*). Additionally, Attorney Pollick submitted an affidavit that sets forth her experience and

qualifications, including her admission to practice law in 1999, law school and other graduate education, membership in professional organizations, legal employment history, and past successful civil rights cases. (*See* Doc. 98-1, *generally*).

Beginning with the proposed range of $450.00 to $510.00 per hour, I do not find Attorney Pollick has established a *prima facie* case with evidence beside her own affidavit that the prevailing market rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895, 104 S. Ct. at 1547. On top of the fact that the CLS chart appears to base this determination solely on an attorney's years of experience, this chart is based on the Philadelphia law firm market, a separate region from the "relevant community" in which Plaintiff's case was litigated and Attorney Pollick routinely practices—Luzerne County or more broadly the Middle District of Pennsylvania forum region. *Dellarciprete*, 892 F.2d at 1183; *Borrell*, 207 F. Supp. 3d at 509 ("I will not consider the CLS chart as it is not relevant to a determination of the prevailing market rate in the Middle District and more specifically to Wilkes-Barre."); *Souryavong v. Lackawanna Cty.*, 159 F. Supp. 3d 514, 527 (M.D. Pa. 2016), *reconsideration denied*, No. 13-CV-1534, 2016 WL 3940717 (M.D. Pa. July 21, 2016) ("[T]he CLS of Philadelphia . . . do[es] not speak to what the prevailing market rates are in the forum litigation, *i.e.*, the Middle District of Pennsylvania."). Attorney Pollick has not offered any further information about the CLS chart to show that the proposed fee range is actually based on cases litigated in the Luzerne County region. *See Young v. Smith*, 269 F. Supp. 3d 251, 267 (M.D. Pa. 2017) ("Moreover, 'in the ordinary case,' the district court's rate-setting determination should 'focus on the community in which the case was litigated,' not the community from which the attorney hails.") (quoting *Miller v. Dugan*, 764 F.3d 826, 831 (8th Cir. 2014). Her affidavit alone is insufficient to support this proposed rate.

Turning to her proposed rate of $275.00 per hour, I note Attorney Pollick cites to a previous rate determination by Judge Mariani in 2016 in support of this figure.

This figure is relatively consistent with previous hourly rates for Attorney Pollick in other civil rights cases within the past five (5) years, including as recently as September of 2017. *See Young*, 269 F. Supp. 3d at 268-70, 272 (performing an in-depth review of previous hourly rate determinations for Attorney Pollick before setting concluding Attorney Pollick's reasonable hourly rate in that case would be $215.00 to $225.00). Further, as noted above, Defendants did not raise specific objections to Attorney Pollick's proposed hourly rate. As such, in light of her qualifications as stated in her affidavit and prior determinations by other district court judges in the Middle District of Pennsylvania, I find $275.00 per hour is a reasonable rate for Attorney Pollick.

Plaintiff requests a rate of $100.00 per hour for Attorney Pollick's legal assistant. As Defendants do not challenge this request, and as case law reflects this figure was found within the range of reasonable hourly rates for legal assistants, I find $100.00 per hour is a reasonable rate for Attorney Pollick's legal assistant. *See, e.g.*, *Souryavong*, 159 F. Supp. 3d at 530 (concluding $100.00 per hour is a reasonable hourly rate for Attorney Pollick's legal assistant).

### (ii)    Hours Billed

To meet the initial burden of proving that the requested fees are reasonable, Plaintiff must submit evidence of the hours worked that is specific enough to allow the court to "determine if the hours claimed are unreasonable for the work performed." *Washington*, 89 F.3d at 1037. To satisfy this burden, a petition should include, "'fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys.'" *Dellarciprete*, 892 F.2d at 1191 (quoting *Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973)). Further, "a chronological listing of time spent per activity by attorneys is essentially a summary of the time spent per task." *Lindy Bros.*, 487 F.2d at 167. Once a fee applicant has met this burden, "[t]he party opposing the fee award then has the burden

to challenge the reasonableness of the requested fee . . . with sufficient specificity to give the fee applicant notice of the objection." *E.E.O.C. v. Fed. Express Corp.*, 537 F. Supp. 2d 700, 721 (M.D. Pa. 2005). Where the opposing party makes specific objections, the burden shifts back to the fee applicant to justify its request. *Interfaith Comm. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 711 (3d Cir. 2005). The Court enjoys considerable discretion to adjust the fee applicant's claimed hours in light of the opposing party's objections. *Fed. Express. Corp.*, 537 F. Supp. 2d at 721.

Attorney Pollick asserts she spent 255.70 hours and her legal assistant spent 49.30 hours working on Plaintiff's case, as reflected in the hours leger she submitted. (*See* Doc. 98-2, "Ex. A," *generally*). The entries on the leger span from June of 2016 to October of 2018 and list the specific tasks performed as well as the amount of time spent on each task. (*Id.*). Accordingly, I find Plaintiff has met his burden of providing "fairly definite information as to the hours devoted to various general activities" regarding this matter. *Dellarciprete*, 892 F.2d at 191. Moreover, in requesting compensation for the hours worked, Plaintiff seeks only $10,000 for each of his successful claims for a total of $30,000,[6] which is less than the lodestar. In the absence of any objections by Defendants as well as my earlier conclusion that attorney's fees are reasonable on only the unreasonable seizure claim, I find the requested amount of $10,000 in attorney's fees per eligible successful claim is reasonable in light of the hours worked and the claims on which Plaintiff prevailed. Attorney Pollick will therefore be awarded fees in the amount of $10,000.

### 2. Costs

Plaintiff also seeks costs in the amount of $3,034.96, pursuant to Rule 54 of the

---

[6] On June 4, 2019, Plaintiff submitted an affidavit requesting an additional $10,000 for the 26.95 hours she has spent on the case responding to the instant motions. (Doc. 125). Attorney Pollick has not submitted a ledger with these hours, and has appeared to depart from her earlier suggested fee calculation method of $10,000 per successful claim. As Plaintiff has not met his burden as to these new hours, awarding these requested attorney's fees would not be reasonable.

Federal Rules of Civil Procedure and 28 U.S.C. § 1920. Ordinarily, a person seeking costs must first submit a bill of costs to the Clerk for taxation. *See* L.R. 54.3 ("All bills of costs requiring taxation shall be taxed by the clerk, subject to an appeal to the court."). *See also Yarnall*, 203. F. Supp. 3d at 569 ("A bill of costs under § 1920 should be determined in the first instance by the Clerk of Court."). Plaintiff did not comply with the local rules; instead of filing a bill of costs to be taxed by the clerk of court within thirty (30) days after the entry of judgment, Plaintiff filed a joint motion for attorney's fees and costs. "Given the mandatory language of Local Rule 54.3," I will deny Plaintiff's request for costs for failure to comply with the local rules. *Kress v. Birchwood Landscaping*, No. 3:05-0566, 2008 WL 11492931, at *2 (M.D. Pa. Sept. 2, 2008).

## IV. Conclusion

For the above stated reasons, Defendants' Motion to Alter or Amend Judgment (Doc. 104), Plaintiff's Motion to Strike (Doc. 118) will be **DENIED**. Plaintiff's Motion for Attorney's Fees and Costs (Doc. 98) will be **GRANTED in part**. An appropriate order follows.


July 9, 2019          /s/ A. Richard Caputo
Date                           A. Richard Caputo
                               United States District Judge